UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEON LIPPETT,

     Plaintiff,

v.

CORIZON HEALTH, INC.; BETH
CARTER, MD; DIANE HERRING;
SHARON DRAVELING; LISA
ADRAY; THOMAS JORDAN;
MICHELLE PIECUCH,

     Defendants.

_____/

Case No. 18-cv-11175

Paul D. Borman
United States District Judge

Anthony P. Patti
United States Magistrate Judge

## ORDER (1) GRANTING DEFENDANTS CORIZON HEALTH, INC. AND BETH CARTER, MD'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 47), AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS DIANE HERRING, SHARON DRAVELING, LISA ADRAY, THOMAS JORDAN, AND MICHELLE PIECUCH'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 56)

## I. INTRODUCTION

Plaintiff Leon Lippett's left foot became infected in late June 2017. He made several attempts to seek treatment before health care personnel at Macomb Correctional Facility, where he was incarcerated, evaluated his condition. His infection worsened and he was sent to the hospital. He remained in the hospital for two months, had a failed skin graft surgery, and suffered permanent kidney damage. In this case he argues that several Michigan Department of Corrections (MDOC) nurses, an MDOC corrections officer, and a doctor provided by Corizon Health, Inc.

(Corizon) were deliberately indifferent to his serious medical needs by denying him immediate treatment on several occasions on June 27 and 28, and by failing to send him to the hospital when he was first treated, on June 28. Plaintiff Lippett also argues that the MDOC defendants were grossly negligent. The MDOC defendants have filed a motion for summary judgment, as have Defendants Dr. Beth Carter and Corizon Health Inc. (ECF Nos. 47, 56.)

Plaintiff "agrees to dismiss Corizon" so the Court grants summary judgment to Defendant Corizon and dismisses Lippett's claim against Corizon. (ECF No. 61, Response to Corizon, PgID 1749 n. 5.) The Court also grants summary judgment to Defendants Beth Carter, Diane Herring, Sharon Draveling, Thomas Jordan, and Michelle Piecuch because Plaintiff Lippett has failed to raise a genuine issue of material fact that any of these defendants took action that rose to the level of violating Lippett's constitutional rights or that they were grossly negligent. The Court finds that there is a genuine dispute of material fact as to whether Defendant Lisa Adray was deliberately indifferent to Plaintiff Lippett's serious medical needs, so the Court denies the MDOC Defendants' Motion for Summary Judgment to the extent that it seeks dismissal of the Eighth Amendment claim against Defendant Adray. (ECF No. 56.)

## II.    FACTS

Because this is a Motion for Summary Judgment, the following facts are recounted in the light most favorable to the non-moving party—here, Plaintiff Leon Lippett. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

On the morning of June 25, 2017, Plaintiff Lippett's second toe on his left foot started "hurting really bad." (ECF No. 61-3, Lippett Dep., PgID 1867.) When he looked at the toe he noticed that it was swollen. (*Id.*) He thought these symptoms were related to his ongoing problem with athlete's foot and did not seek treatment. (*Id.*) The following day, the toe continued to swell and the pain got worse. (*Id.* at PgID 1868.) He decided to seek treatment.

As a prisoner in the Macomb Correctional Facility, Lippett had two options— if he believed he had an urgent or emergent health condition he could notify a prison staff member who would be required to contact health care services and explain the problem, or, for a more routine health care service, he could fill out a Health Care Request (kite) and leave it in a box to be picked up by a nurse that night. (ECF No. 61-2, MDOC Policy Directive 03.04.100, PgID 1773.) Health care service staff members are required to respond to staff contacts about urgent conditions within two hours and are required to triage a kite within one business day of receiving it. (*Id.*) Generally, the night shift nurses pick up each day's kites from the boxes spread throughout the facility and review them during the course of their shift. (ECF No.

61-4, Cooper Dep., PgID 2034; *see also* ECF No. 61-4, Herring Dep., PgID 2075.) Based on the information in the kite, the reviewing nurse will evaluate the urgency of the condition and schedule an appointment accordingly. (ECF No. 61-4, Cooper Dep., PgID 2034.) If the nurse determines that the kite describes an emergency, the prisoner must be seen immediately; if the kite describes an urgent condition, the nurse must schedule an appointment "no later than the next business day." (ECF No. 61-2, MDOC Policy Directive 03.04.100, PgID 1773.)

Lippett filled out a kite the morning of June 26th. (ECF No. 61-3, Lippett Dep., PgID 1867.) He wrote, "I have dealt with athlete's foot for a long time. I have had several different types of ointments. My foot has developed a severe infection which has my foot in much pain. I need immediate attention." (ECF No. 61-2, Kite, PgID 1759.) The kite was stamped as received by health services at 10:41 PM on June 26. (ECF No. 61-2, Kite, PgID 1759.)

At 6:17 AM on June 27, Defendant Nurse Herring reviewed Lippett's kite and scheduled him for a "nurse sick call" for June 28. (ECF No. 61-2, Kite Response, PgID 1761.) She stated that she scheduled him for the 28th instead of the 27th because the schedule for the 27th would have already been completed by 6:17 in the morning and she considered Lippett's complaint—an infected foot—a situation that required health care attention within "a day or two," not an emergency like a report of chest pain. (ECF No. 61-4, Herring Dep., PgID 2075–77.) Health Unit Manager

(HUM) Cooper agreed with Nurse Herring that infections are urgent, not emergent, situations. (ECF No. 61-4, Cooper Dep., PgID 2044.) The kite was returned to Lippett with instructions to "please wait for health care call out." (ECF No. 61-2, Kite, PgID 1759.)

Lippett's condition worsened over the course of June 27th. His foot continued to swell and he began to feel sick, experiencing chills and feeling feverish at times. (ECF No. 61-3, Lippett Dep., PgID 1868.) He was still able to wear his shoe and attend his call out in the school building. (*Id.* at PgID 1868–69.) His bunkmate, Corey Crews, who had seen Lippett's swollen toe the night before and "thought nothing of it," recalled Lippett complaining that he was cold, then complaining that he was hot. (ECF No. 61-3, Crews Dep., PgID 1936–37.) Crews said Lippett was not himself—sweating, complaining and skipping a special meal though he normally loves to eat—and by the evening of the 27th Crews no longer thought that "it was no big deal." (*Id.* at 1937.)

At 6:30 PM on the 27th, Lippett decided to seek immediate medical treatment. (ECF No. 61-3, Lippett Dep., PgID 1868–69.) He asked the yard supervisor if he could walk to health care to have his infection assessed. (*Id.* at PgID 1869.) The yard supervisor agreed and found an officer to escort Lippett to health care. (*Id.*) As soon as Lippett arrived and before anyone in health services was able to see him, a siren rang out and Lippett had to return to his unit for an emergency count. (*Id.*) The

corrections officer logbook confirms that a "mobilization" began at 7:10 PM and lasted until 10:08 PM. (ECF No. 61-2, Logbook, PgID 1792–93.)

When the lockdown was over, Lippett got the attention of the first officer he saw, Officer Yung. (ECF No. 61-3, Lippett Dep., PgID 1870.) Lippett told Officer Yung that he had an infection and needed to see medical services. (*Id.*) Lippett remembered Officer Yung getting on the phone with health care and being told that they were unable to see Lippett at that time. (*Id.*) Lippett then asked if he could join the nightly "med lines," where health care personnel hand out regularly prescribed medicines, to which Officer Yung said yes. (*Id.* at PgID 1871.) Officer Yung recalled Lippett showing him his "swollen and discolored" foot, agreeing that Lippett's foot needed medical attention, and then sending Lippett to join the med lines. (ECF No. 47-5, Yung Dep., PgID 831, 833.)

Once he was in the med lines, Lippett was seen by a nurse, who took his temperature and looked at his foot. (ECF No. 61-3, Lippett Dep., PgID 1871–72.) The nurse said that his temperature was 101 and "acknowledged that [Lippett's] foot was in bad shape," but told him that the only thing that she could do for him was to give him Tylenol. (*Id.* at PgID 1872.) Lippett testified that the nurse who saw him was Nurse Herring, (*id.* at PgID 1871), but Nurse Herring said that she was not working the night of June 27th. (ECF No. 61-4, Herring Dep., PgID 2095–96.) Her

6

timesheet shows that she punched out at 9:03 AM on June 27th and did not punch in again until 3:06 PM on June 28th. (ECF No. 45-14, Herring Timesheet, PgID 754.)

That night, Lippett was unable to fall asleep due to the pain in his foot. (ECF No. 61-3, Lippett Dep., PgID 1873.) So, at 12:30 AM he went to the desk in his housing unit and asked Officer Markus to send him back to health care. (*Id.*) Officer Markus agreed and sent him over with an officer escort. (*Id.*) At health care, Lippett said that Nurse Herring and Defendant Nurse Draveling told him they could not help him even though he "literally begged them for some help." (*Id.* at PgID 1874.) However, neither Nurse Herring nor Nurse Draveling were on duty the night of June 27th. (ECF No. 45-14, Draveling & Herring Timesheets, PgID 753–754.) Officer Markus did not recall interacting with Lippett or sending him to health care on the night of June 27th. (ECF No. 61-3, Markus Dep., PgID 1992–93.) Lippett's bunkmate, Crews, remembered Lippett saying that he went to health care in the middle of the night but that they refused to see him. (ECF No. 61-3, Crews Dep., PgID 1937.)

When Lippett woke up the morning of June 28th, he had a kite response waiting on his desk, which informed him that he had a health care call out at 9:30 AM. (ECF No. 61-3, Lippett Dep., PgID 1877.) So, at 9:30 he made his way to health care, walking with the help of Anthony Colbert because his foot was so swollen and painful that it could not bear weight. (*Id.*; ECF No. 61-3, Colbert Dep., PgID 1952.)

When he arrived, Officer Jordan, the corrections officer at the front desk, informed Lippett that his call out had been rescheduled. (ECF No. 61-3, Lippett Dep., at PgID 1878.) Lippett told Officer Jordan that his foot was swollen, and that he had a really bad infection, but Officer Jordan said that there was nothing he could do because the appointment was canceled. (*Id.*) Officer Jordan testified that he has no control over how health care decides who to see and when to see them—he would only intervene by informing health care personnel that there is a real emergency if he saw someone having difficulty breathing, bleeding profusely, experiencing chest pain, or experiencing other obviously life-threatening symptoms. (ECF No. 61-5, Jordan Dep., PgID 2245–46.) After Officer Jordan informed Lippett that his appointment was canceled, Lippett "turned around and just limped back out of health care," returning to his housing unit with the help of Anthony Colbert. (ECF No. 61-3, Lippett Dep., PgID 1878–79; ECF No. 61-3, Colbert Dep., PgID 1952.)

Lippett testified that he believes Defendant Nurse Adray, in her role as supervisory nurse, canceled his appointment based on a determination that the complaint in his kite was not a priority. (*See* ECF No. 61-3, Lippett Dep., PgID 1912, 1914.) Officer Robison also testified that she thinks Nurse Adray canceled the appointment. (ECF No. 61-3, Robison Dep., PgID 1998.) Nurse Adray did not believe she canceled Lippett's initial appointment and stated that she does not

remember why it was canceled because she is not "privy to that information at all." (ECF No. 61-4, Adray Dep., PgID 2215.)

The pain in Lippett's foot continued to increase as the foot continued to swell. (ECF No. 61-3, Lippett Dep., PgID 1879.) It got to the point where Lippett decided to risk getting a ticket for being out of place by going back to health care without a call out or authorization from an officer. (*Id.* at 1879–80.) He walked over with the help of a fellow inmate, but before he entered the building, Officer Jordan came out and stopped him. (*Id.* at PgID 1880.) Lippett testified that Officer Jordan told him that he could not come in, despite Lippett explaining that he had a really bad infection and that he was dizzy and struggling to breathe. (*Id.*) Officer Jordan did not recall this interaction, but testified that it was his practice to send prisoners back to follow the proper procedure when they did not have authorization to be in health care. (ECF No. 61-5, Jordan Dep., PgID 2265–69.) Lippett limped back to his housing unit with the help of Kevin Harrington and an inmate with the last name Ghoston. (ECF No. 61-3, Harrington Dep., PgID 1945–46.)

When Lippett arrived back in his housing unit he sought help from Officer Robison. (ECF No. 61-3, Lippett Dep., PgID 1881.) He explained his symptoms and told her that he had had an appointment but it had been canceled. (ECF No. 61-3, Robison Dep., PgID 1998.) Officer Robison called health care and spoke with Nurse Adray, who informed her that Lippett's appointment would be rescheduled. (*Id.*) She

then looked at Lippett's foot, saw how swollen it was, and called health care back to ask if there was any way they could see him. (*Id.*) Nurse Adray informed Officer Robison that Lippett would be seen when there was a nurse available. (*Id.*) Officer Robison recorded this information in the correctional officer logbook, writing that Lippett "will be seen when there is a nurse available" and, at 12:39 PM, that "[p]er Nurse Lisa," Lippett's appointment will be rescheduled for another day. (ECF No. 61-2, Logbook, PgID 1795.) Nurse Adray did not remember this call, but did not deny that it occurred. (ECF No. 61-4, Adray Dep., PgID 2216.)

Around 2:15 PM on June 28th, Lippett tried again to get attention from health care. (ECF No. 61-3, Lippett Dep., PgID 1882–83.) He limped to health care and told Officer Rushing about his problem, showed Officer Rushing his foot, and asked him for help. (*Id.* at PgID 1883.) Officer Rushing went inside, talked to a nurse, he could not remember which one but stated that his best guess was Nurse Adray, and the nurse told Officer Rushing that they did not have time to see Lippett. (ECF No. 61-3, Rushing Dep., PgID 2029.) Officer Rushing told Lippett they could not see him and Lippett went back to his unit. (*Id.*) Officer Rushing testified that health care was short staffed at the time, though he also testified that this interaction occurred in the morning of the 28th, not in the afternoon. (*Id.* at PgID 2028–29.)

Anthony Woods was in health care services receiving treatment at some point on the 28th and overheard "the head nurse" telling another nurse that Lippett was

"faking" and instructing the other nurse to send Lippett back. (ECF No. 61-3, Woods Dep., PgID 1961.) The other nurse said that she told the unit staff to send Lippett over and said that she could not send him back, but the "head nurse" insisted. (*Id.*) Woods could not remember the exact day on which this occurred, or the names of the nurses involved, but described the time of day as the "evening" and said that Lippett was sent to the hospital the next day. (*Id.* at PgID 1961–65.) Therefore, this conversation occurred sometime on June 28th. Lippett believes that Nurse Adray was the "head nurse" Woods overheard saying that Lippett was faking. (*See* ECF No. 60, Response to MDOC MSJ, PgID 1051.) Nurse Adray was the supervising nurse at the time, and she worked until 3:46 on June 28th. (ECF No. 45-14, Adray Timesheet, PgID 751.) Nurse Adray did not remember this incident and testified that the only interaction she had with Lippett was talking to him as he was waiting to see Dr. Carter on June 29th. (ECF No. 61-4, Adray Dep., PgID 2211–12.)

Lippett took two more steps to seek treatment the afternoon of the 28th. First, when he returned to his unit, Lippett called his fiancée to ask her to call the facility to seek help for him. (ECF No. 61-3, Lippett Dep., PgID 1884.) Second, he went to Officer Tolley, the acting supervisor of his housing unit. (*Id.* at 1885–86.) Officer Tolley called health care and said "I think there is like actually really something wrong. You guys might want to call him out." (ECF No. 61-3, Tolley Dep., PgID 2008.) She remembered this call occurring around 4:00 PM. (*Id.* at PgID 2018.)

Officer Tolley believed something was wrong because Lippett, who was not "constantly seeking medical attention" and who was "generally very healthy," was adamant that something was wrong and because his foot was very swollen and purple in color. (*Id.* at PgID 2010–11.) She also thought that health care was under the incorrect assumption that Lippett's complaint was simply about his athlete's foot acting up. (*Id.* at PgID 2013.)

Officer Tolley remembered making one call to health care and then leaving for the day on the 28th. (*Id.* at PgID 2018.) She said that she spoke to Defendant Nurse Piecuch, who said "it [sic] just athlete's foot." (*Id.* at PgID 2019.) Lippett remembered Officer Tolley first speaking to Nurse Piecuch, who said that his call out had been rescheduled and they could not see him, then calling administration to inform them that Lippett was "in really bad shape" and that health care was refusing to see him. (ECF No. 61-3, Lippett Dep., PgID 1887–88.) Officer Tolley remembered calling administration, but believed that she only did so on the morning of June 29th. (ECF No. 61-3, Tolley Dep., PgID 2018–19.) Nurse Piecuch did not remember speaking to Officer Tolley, but testified that if she answered the call she would have taken the patient's number and the reason for the call, then reported it to the supervisor or the RN on duty, who would determine what to do with the patient and then call the unit back. (ECF No. 61-4, Piecuch Dep., PgID 2176–78.) This is

the protocol because Nurse Piecuch is an LPN and is therefore not allowed to assess patients. (*Id.* at PgID 2167.)

Later that day, June 28th, shortly before 4:30 PM, Lippett was called out by health care. (ECF No. 61-3, Lippett Dep., PgID 1889.) Nurse Herring saw Lippett first. (ECF No. 61-4, Herring Dep., PgID 2079.) According to her report, Lippett reported that the pain and burning in his left foot started three days prior in his toe. (ECF No. 48, Herring Report, PgID 862.) He said the pain was going up his foot, that he had experienced chills for much of the day before, and that his urine was dark in color. (*Id.* at PgID 864.) Nurse Herring noted that Lippett was walking very slowly with a limp, that there was swelling and redness on the top of his left foot, and that the redness, swelling, and pain were signs and symptoms of an infection. (*Id.* at PgID 862.) She also noted that the foot did not feel hot to the touch. (*Id.*) She took his vital signs and recorded a temperature of 98.9. (*Id.*) Lippett testified that Nurse Piecuch and Nurse Sandy Tyler treated him that day. (ECF No. 61-3, Lippett Dep., PgID 1889.) But Nurse Piecuch testified that she never treated Lippett (ECF No. 61-4, Piecuch Dep., PgID 2181) and Nurse Herring filled out the paperwork for that appointment. (ECF No. 48, Herring Report, PgID 862.) Lippett also testified that, during this evaluation, Nurse Adray stuck her head into the examination room and "kind of sarcastically" said "What's the big emergency?." (ECF No. 61-3, Lippett

Dep., PgID 1891.) Nurse Adray, however, punched out of work on June 28 at 3:46 PM. (ECF No. 45-14, Adray Timesheet, PgID 751.)

Soon after the nurse's evaluation began, Defendant Dr. Beth Carter became involved. (*See* ECF No. 61-3, Lippett Dep., PgID 1889–90 (describing Dr. Carter entering the evaluation room after seeing Lippett's foot as he walked in); ECF No. 61-5, Carter Dep., PgID 2336 (indicating that Nurse Herring asked Dr. Carter to come look at Lippett's foot).) Dr. Carter asked Nurse Herring to get a urine sample and a culture of the fungus between his toes and instructed her to give Lippett an injection of Rocephin, a wide-spectrum antibiotic. (ECF No. 48, Herring Report, PgID 864; ECF No. 61-5, Carter Dep., PgID 2336–37; *see also* ECF No. 61-3, Lippett Dep., PgID 1890–91.) Nurse Herring followed these instructions, noting that Lippett tolerated the treatment well. (ECF No. 48, Herring Report, PgID 864.) Nurse Herring gave Lippett a cane and some Tylenol, then told him to call health care "if he develops streaking, increase in redness, swelling and/or pain." (*Id.*) They scheduled a follow-up appointment for the next morning to see if he responded to the antibiotic. (ECF No. 61-4, Herring Dep., PgID 2088; ECF No. 61-5, Carter Dep., PgID 2337.)

Lippett did not respond to the antibiotic. He continued to experience pain through the night as his foot was turning colors. (ECF No. 61-3, Lippett Dep., PgID 1892.) Sometime before midnight he notified Officer Markus that his foot was

14

bothering him, who saw that his foot was "red around the ankle." (ECF No. 61-3,

Markus Dep., PgID 1989.) Officer Markus told Lippett that he would send him to

health care whenever Lippett needed. (*Id.*) Around 12:40 AM, Lippett took Officer

Markus up on his offer. (*Id.*) Officer Markus called health care and spoke with Nurse

Draveling, who said she would call back. (*Id.* at PgID 1990.) Eight minutes later,

Nurse Draveling called back and said to send Lippett over. (*Id.*)

Nurse Draveling saw Lippett at 12:50 AM on June 29th. (ECF No. 48,

Draveling Report, PgID 871; ECF No. 61-4, Draveling Dep., PgID 2123.) She took

his vital signs and evaluated his foot. (ECF No. 61-4, Draveling Dep., PgID 2125.)

His temperature was 98.4 and his foot was red and swollen with no streaking visible.

(ECF No. 48, Draveling Report, PgID 871.) He reported taking an ibuprofen two

hours prior, and she knew he had Tylenol for pain management. (*Id.*; ECF No. 61-

4, Draveling Dep., PgID 2125.) She also knew that he had been seen during the

afternoon, that he had been given an injection of antibiotics, and that he was

scheduled for a follow up the next morning. (ECF No. 61-4, Draveling Dep., PgID

2125.) Based on this knowledge, she made sure he had enough pain medication and

sent him back to his unit with instructions to notify health care about new or

worsening symptoms. (*Id.*; ECF No. 48, Draveling Report, PgID 871.) Officer

Markus made sure to check on Lippett throughout the night to make sure that he was

okay. (ECF No. 61-3, Markus Dep., PgID 1990.)

By the morning of June 29th, Lippett's foot was red, inflamed, purple, and swollen up past his ankle. (ECF No. 48, Carter Report, PgID 869.) Lippett reported his pain level as an 8-10 out of 10. (*Id.*) He left his bunk and went to the day room, where he saw Officer Tolley. (ECF No. 61-3, Lippett Dep., PgID 1893.) She "got pretty hysterical" and got on the phone to get Lippett seen by health care. (*Id.*) She called both HUM Cooper and the lieutenant in order to ensure that health care would see Lippett right away. (ECF No. 61-3, Tolley Dep., PgID 2019.) Officer Tolley remembers Lippett's foot as "disgusting," "oozy," and "purple." (*Id.* at PgID 2020.)

Officer Tolley borrowed a different inmate's wheelchair and had Lippett pushed to health care to be seen by Dr. Carter. (ECF No. 61-3, Lippett Dep., PgID 1894.) Lippett arrived around 8:30 AM. (*Id.*) Dr. Carter noted that Lippett's foot was "now red inflammed [sic] and is purple and more swollen now." (ECF No. 48, Carter Report, PgID 869.) She noted that he had taken Tylenol and Motrin overnight, which could mask a fever—his temperature that morning was 98.2—and she diagnosed him with cellulitis. (*Id.*) Based on that assessment, Dr. Carter gave him an injection of 60 milligrams of Toradol, a pain medication, and sent him to the hospital. (*Id.*) According to the corrections officer logbook, Lippett was on the way to the hospital by 9:05 AM. (ECF No. 61-2, Logbook, PgID 1798.) Dr. Carter testified that she sent him to the hospital because his symptoms had worsened even though he had been treated with an antibiotic. (ECF No. 61-5, Carter Dep., PgID 2344–45.)

Lippett was first sent to Henry Ford Macomb. (ECF No. 61-3, Lippett Dep., PgID 1894–95.) There, the doctors ran several tests and gave Lippett a round of intravenous (IV) vancomycin to treat his infection. (ECF No. 48, Henry Ford Macomb Records, PgID 872–77.) The lab results from his blood tests were abnormal, showing elevated creatinine and blood urea nitrogen levels. (*Id.* at PgID 874.) By 1:12 PM Lippett was cleared for transfer to Duane Waters Hospital (DWH), an MDOC hospital, for further treatment. (*Id.*) Upon arrival at DWH at 2:28 PM his condition was noted as stable. (ECF No. 48, DWH Records, PgID 878.)

On June 30 at DWH, the doctor noted that Lippett's foot had developed a "very large fluid-filled blister." (*Id.* at PgID 882.) That day, the doctor also decided to discontinue the IV vancomycin due to his elevated creatine levels and to change the treatment to clindamycin. (*Id.* at PgID 883.) That night, Lippett had a 102.6 degree fever. (*Id.* at PgID 884.) The following day, doctors at DWH drained his blister, noting that there was no pus in it, and added Zosyn to his IV antibiotic cocktail in order to fight a broader spectrum of bacteria. (*Id.* at PgID 885.) He continued to have a fever, developed new blisters, and the swelling extended from his foot to his knee, so, on the afternoon of July 2, Lippett was transferred to Henry Ford Allegiance Hospital for additional testing. (*Id.* at PgID 887–96.)

The tests at Henry Ford Allegiance led to diagnoses of fever, leukocytosis, cellulitis, and severe sepsis. (ECF No. 49, Henry Ford Allegiance Records, PgID

907.) Based on those diagnoses, Lippett was given another dose of vancomycin and transferred to an acute care hospital, McLaren. (*Id.*) At McLaren he was given more IV antibiotics (vancomycin and Zosyn) to treat his cellulitis and sepsis. (ECF No. 50, McLaren Records, PgID 914.) By July 4, Lippett's leg was red, hot, and swollen all the way to his thigh, and he had blisters along his foot, ankle, and calf. (*Id.* at PgID 915.) He continued to run a fever, with a temperature of 101.6, but the doctor at McLaren believed that the sepsis picture had improved since Lippett was admitted on July 2. (*Id.* at PgID 917, 921.) The doctors at McLaren changed his antibiotic program to Vibativ and Zosyn. (*Id.* at PgID 922.) A consulting surgeon at McLaren, Dr. Morin, examined Lippett's foot on July 6 and determined that "this is not a surgical issue." (*Id.* at PgID 924.)

On July 7, Lippett's condition was improving. (*Id.* at PgID 927.) His fever, though ongoing, was "more controlled," his blister areas were "much improved," and the swelling and redness along his leg were "nearly completely resolved. (*Id.* at PgID 927–29.) Based on the improvement, the doctor discontinued the use of Zosyn. (*Id.* at PgID 931.) On July 10, Lippett was discharged from McLaren and sent back to DWH for continued antibiotic treatment, antifungal treatment for his underlying athlete's foot, and wound care for his blisters. (*Id.* at PgID 932–37.) In the discharge report, the doctor did note that his kidney functions were "closely monitored and

normalized towards the end of his hospitalization," after the vancomycin and Zosyn were discontinued. (*Id.* at PgID 933.)

Lippett remained at DWH until August 29, when he was discharged. (ECF No. 61-3, Lippett Dep., PgID 1897.) He was hospitalized again from November 14, 2017 until December 5, 2017 when his wound was re-infected. (*Id.* at PgID 1897–98.) Sometime in early 2018, January or March, Lippett had a skin graft surgery on the wound, though the graft was unsuccessful. (*Id.* at PgID 1898–99.) As of October 11, 2018, the wound was not fully healed, and Lippett was experiencing nerve pain. (*Id.* at PgID 1861.) His foot frequently swells up, which forces him to use a cane to walk, and Lippett believes those symptoms may last the rest of his life. (*Id.* at 1863.) He also developed chronic kidney disease. (*Id.* at PgID 1864.)

Two doctors retained by Lippett, Bruce Polsky, M.D. and Austin Pattner, M.D., have opined that the delay in diagnosing and treating Lippett's cellulitis led to his sepsis, which led to his kidney failure. (ECF No. 61-2, Polsky Disclosure, PgID 1828; ECF No. 61-2, Pattner Disclosure, PgID 1839–41.) Chad Zawitz, M.D. and Louis Shicker, M.D., retained by Dr. Carter and Corizon, have opined that linking Lippett's ultimate kidney damage to the early treatment of his cellulitis is speculative at best because Lippett's symptom progression and reaction to treatment was unusual. (ECF No. 47-6, Shicker Disclosure, PgID 851–52; ECF No. 47-7, Zawitz Disclosure, PgID 857.) Nurses Carol Rogers, retained by Lippett, and

Kathryn Wild, retained by the MDOC defendants, similarly disagree about whether the care provided by Nurses Herring, Draveling, Adray, and Piecuch was appropriate and whether it contributed to a delay that worsened Lippett's ultimate outcomes. (ECF No. 61–2, Rogers Disclosure, PgID 1833–35; ECF No. 45-7, Wild Disclosure, PgID 534–35.)

### III.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's must show that a genuine dispute of material fact exists for each element "on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon its mere allegations or denials in the pleadings, but must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party also may not rely on "[c]onclusory assertions, supported only by [his or her] own opinions," *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008), but must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*,

355 F.3d 515, 533 (6th Cir.2004)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran*, 788 F.3d at 204. At the same time, the non-moving party must produce enough evidence to allow a reasonable jury to find in its favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. "The 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact

exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" Ibid. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558–59 (internal citations omitted).

A court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.    ANALYSIS

The MDOC defendants move for summary judgment on Lippett's Eighth Amendment and gross negligence claims against them on the basis of qualified immunity and state-law governmental immunity, as well as on the merits. (ECF No. 56-1, MDOC MSJ, PgID 1018–31.) Defendant Dr. Carter moves for summary judgment on the merits of Lippett's Eighth Amendment claim against her. (ECF No. 47, Corizon MSJ, PgID 780–85.) Each argument is addressed in turn.

### A.    Qualified Immunity

A government official is entitled to qualified immunity if the facts alleged show that his or her conduct did not violate a constitutional right, or if the facts alleged show a violation of a constitutional right that was not clearly established at

the time of the violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (identifying two-step qualified immunity inquiry); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the *Saucier* steps may be addressed in whichever order makes the most sense in a given case). Here, the MDOC Defendants raise a defense of qualified immunity to Lippett's Eighth Amendment claim, Dr. Carter does not.

In the Eighth Amendment context, it is clearly established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations and citations omitted). Therefore, if the facts, considered in the light most favorable to Lippett, show deliberate indifference to his serious medical needs, the MDOC defendants will not be entitled to qualified immunity. If they do not show indifference, summary judgment will be appropriate on qualified immunity grounds. *See, e.g.*, *Phillips v. Roane Cty.*, 534 F.3d 531, 539–45 (6th Cir. 2008) (analyzing whether facts show deliberate indifference in order to decide qualified immunity claim).

B. **Eighth Amendment**

Deliberate indifference Eighth Amendment violations have two components: the objective denial of care for "a 'sufficiently serious' medical need;" and the subjective "sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (citing *Farmer v. Brennan*,

511 U.S. 825, 834 (1994), *Estelle*, 429 U.S. at 104, and *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). These requirements ensure that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

The objective component can be shown in three ways. First, a showing that a medical issue "so obvious that even a lay person would easily recognize the need for a doctor's attention . . . was not addressed within a reasonable time frame" establishes the objective element. *Blackmore*, 390 F.3d at 899–900 (finding that jail officials' failure to address "classic signs of appendicitis" for over 48 hours satisfied the objective component); *see also Phillips*, 534 F.3d at 540 (finding that prison officials' failure to treat unmanaged diabetes for two weeks even after finding Phillips "unconscious, not breathing, and without a pulse" satisfied the objective prong). Second, medical proof that an unreasonable delay in treatment of a "seemingly minor or non-obvious" medical need actually harmed the plaintiff establishes the objective component. *Blackmore*, 390 F.3d at 898 (distinguishing *Napier v. Madison Cty*, 238 F.3d 739 (6th Cir. 2001) (finding no objective component where prison officials allowed an arrestee to miss a scheduled dialysis appointment based on plaintiff's failure to provide medical proof of harm caused by missing the appointment)).

Third, where the plaintiff actually receives some medical care, the plaintiff establishes the objective element by showing "grossly inadequate care," "medical care which is so cursory as to amount to no treatment at all," or "a decision to take an easier but less efficacious course of treatment." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843–44 (6th Cir. 2002) (internal quotations and citations omitted). In the Sixth Circuit, medical personnel are held to a higher standard of care than other officers—a medical professional cannot simply provide "some treatment" but must provide care that does not "consciously expos[e] the patient to an excessive risk of harm." *Phillips*, 534 F.3d at 544. The standard is whether a reasonable medical professional would have thought the care was constitutionally sufficient. *See Terrance*, 286 F.3d at 844 ("[T]he relevant inquiry as to whether the defendants provided grossly inadequate care was 'whether a reasonable doctor . . . could have concluded his actions were lawful.") (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1034 (11th Cir. 1989)).

The subjective component of an Eighth Amendment violation requires a showing that the official in question "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he disregarded that risk." *Phillips*, 534 F.3d at 540 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact the risk was obvious." *Farmer*, 511 U.S.

at 842. The subjective knowledge of each defendant is analyzed separately and one defendant's knowledge should not be "automatically imputed to the others." *Rouster v. County of Saginaw*, 749 F.3d 437, 446–54 (6th Cir. 2014) (citing *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).

Lippett argues that his foot infection satisfies the objective component under the first method because an infection is the type of serious condition that a layperson would know requires medical attention. (*See* ECF No. 60, Response to MDOC MSJ, PgID 1058; ECF No. 61, Response to Corizon MSJ, PgID 1750 (citing *Blackmore*).) Defendants maintain that Lippett received some treatment and therefore must show that the treatment was grossly inadequate or unconstitutionally cursory. (*See* ECF No. 47, Corizon MSJ, PgID 1020–21; ECF No. 56-1, MDOC MSJ, PgID 781–83.)

Lippett's rapid deterioration and subsequent complications do suggest that his infection, later diagnosed as cellulitis, was a serious medical condition, just like the appendicitis in *Blackmore* and the unmanaged diabetes in *Phillips*. *Blackmore*, 390 F.3d at 899–900; *Phillips*, 534 F.3d at 540. Indeed, the Sixth Circuit has acknowledged that, "[i]f not treated promptly, cellulitis can quickly spread through the body and cause sepsis." *Bunche v. United States*, No. 17-6190, 2018 WL 4959029, *1 (6th Cir. 2018). But, unlike the plaintiffs in *Blackmore* and *Phillips*, Lippett received prompt care from some of the defendants. So, whether Lippett's serious medical need was objectively ignored is a close question. Answering it

requires analyzing the actions of each defendant separately. *Cf. Terrance*, 286 F.3d at 844–47 (applying the Eighth Amendment standard to each defendant's individual actions). Because the question of whether each defendant subjectively perceived and disregarded Lippett's medical need is closely tied to the objective analysis, the objective and subjective components are considered together.

### i. Dr. Carter

Dr. Carter first learned of Lippett's condition when Nurse Herring asked her to assess his foot on June 28th. (ECF No. 61-5, Carter Dep., PgID 2327, 2336.) During that evaluation, she asked for a urine sample and a culture of the probable source of the infection, and she prescribed an injection of a wide spectrum antibiotic. (ECF No. 48, Herring Report, PgID 864; ECF No. 61-5, Carter Dep., PgID 2336–37; *see also* ECF No. 61-3 Lippett Dep., PgID 1890–91.) She also scheduled a follow-up for the next morning. (ECF No. 61-4, Herring Dep., PgID 2088; ECF No. 61-5, Carter Dep., PgID 2337.) When Lippett's symptoms worsened in response to the antibiotic, Dr. Carter gave him pain medication and sent him to the hospital. (ECF No. 48, Carter Report, PgID 869.) Dr. Carter addressed Lippett's serious medical needs within a reasonable time frame—she addressed them as soon as she was aware of them. *Contra Blackmore*, 390 F.3d at 899–900 (officers failed to address symptoms for over 48 hours).

In addition, the treatment that Dr. Carter provided was not cursory, was not "grossly inadequate," *Terrance*, 286 F.3d at 843–44, and was certainly more than "some treatment." *Phillips*, 534 F.3d at 544. Although Dr. Polsky opined that "Mr. Lippett should have been hospitalized and started on IV antibiotics much sooner than was the case here," second-guessing Dr. Carter's course of treatment would constitutionalize a medical malpractice claim. (ECF No. 61-2, Polsky Disclosure, PgID 1828); *see Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Further, Dr. Polsky's opinion falls well short of declaring that no reasonable doctor could conclude that Dr. Carter's actions were lawful. *See Terrance*, 286 F.3d at 844.

Based on the undisputed facts, Dr. Carter did not fail to address Lippett's serious medical needs in a reasonable time frame and did not provide grossly inadequate medical care. Because there is no genuine issue of material fact as to whether Dr. Carter violated the Eighth Amendment, her Motion for Summary Judgment (ECF No. 47) is granted.

### ii. Nurse Draveling

Although Lippett testified that Nurse Draveling, along with Nurse Herring, denied him care when he went to health care and begged for help around 12:30 AM the morning of June 28th, the timesheets for both nurses reveal that neither were on

duty that night. (ECF No. 61-3, Lippett Dep., PgID 1873–74; ECF No. 45-14, Draveling & Herring Timesheets, PgID 753–754.) Although Lippett's testimony creates an issue of fact as to whether the nurses working the night shift from June 27th to June 28th denied him care, it is insufficient to create a genuine issue of material fact regarding Nurse Draveling's actions. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Therefore, the only possible basis for the claim against Nurse Draveling is her examination of Lippett during the night shift from June 28th to June 29th.

The analysis for Nurse Draveling is nearly identical to the analysis for Dr. Carter. Nurse Draveling learned about Lippett's condition when Officer Markus called health care at 12:40 AM on June 29th. (ECF No. 61-3, Markus Dep., PgID 1990.) Eight minutes later, Nurse Draveling called back and agreed to see Lippett right away. (*Id.*) She took his vital signs, finding a normal temperature, and evaluated his foot, which was red and swollen without streaking. (ECF No. 61-4, Draveling Dep., PgID 2125; ECF No. 48, Draveling Report, PgID 871.) She learned that he had taken an ibuprofen two hours prior, that he had Tylenol for pain management, that he had been given an antibiotic injection in the afternoon, and that he had an

appointment the next morning. (*Id.*) She made sure he had enough pain medication and told him to notify health care about new or worsening symptoms. (*Id.*)

Nurse Draveling did not ignore Lippett's medical needs. She examined him within ten minutes of learning of his complaint and determined that no additional treatment was needed at that time. Lippett has not provided any evidence that a reasonable nurse would consider Nurse Draveling's actions unlawful—even Nurse Rogers, hired by Lippett for this case, did not directly criticize Nurse Draveling's actions in her disclosure. (*See* ECF No. 61-2, Rogers Disclosure, PgID 18333–35.) Even if her determination that Lippett did not need additional treatment was negligent, negligence is not grossly inadequate or cursory care and does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106. Finally, no facts show that Nurse Draveling perceived a substantial risk of Lippett's infection worsening if she did not immediately seek permission to send him to the hospital—he had a normal temperature and there was no streaking in his foot, the same symptoms he had eight hours earlier when he was treated with an antibiotic that is generally given every 12-24 hours. (*See* ECF No. 47-7, Shicker Disclosure, PgID 857.) The undisputed facts show that Nurse Draveling was not deliberately indifferent to Lippett's serious medical needs, so she is entitled to qualified immunity. The Court grants summary judgment to Nurse Draveling on the Eighth Amendment claim.

### iii. Nurse Herring

There are two possible bases for the claim against Nurse Herring. First, Nurse Herring reviewed Lippett's June 26 kite and scheduled him for an appointment on June 28th. (ECF No. 61-2, Kite Response, PgID 1761.) Second, she treated Lippett on the afternoon of June 28th. (ECF No. 48, Herring Report, PgID 862.) As discussed above, Lippett's testimony that the nurses working the night shift from June 27th to June 28th denied him care cannot form a basis for a claim against Nurse Herring because she was not on duty at that time. (ECF No. 45-14, Draveling Timesheet, PgID 753.)

The analysis of Nurse Herring's treatment of Lippett on June 28th is the same as the analysis for Dr. Carter and Nurse Draveling. She saw him, took a history of his symptoms, took his vital signs, evaluated his foot, then asked Dr. Carter to assist in his care in order to get him antibiotic treatment for what she considered "signs and symptoms of an infection." (ECF No. 48, Herring Report, PgID 862–64.) She scheduled him for a follow-up appointment. (ECF No. 61-4, Herring Dep., PgID 2088; ECF No. 61-5, Carter Dep., PgID 2337.) These undisputed facts show that, on June 28th, Nurse Herring, like Dr. Carter and Nurse Draveling, addressed Lippett's infection with measures that were, at worse, negligent. She also did not make the ultimate decision to treat Lippett with an antibiotic injection rather than sending him to a hospital for IV antibiotics—that was Dr. Carter's decision to make. (*See* ECF

No. 61-4, Cooper Dep., PgID 2041 (indicating that nurses may only call ambulances to take patients to the hospital in situations where the patient is unresponsive or otherwise requires "split-second decision-making").) Nurse Herring's action on June 28th were not deliberately indifferent.

It is a closer question whether she was indifferent to Lippett's serious medical needs on June 27th, when she reviewed Lippett's kite. The kite informed her of the following facts: sometime before 10:41 PM on June 26th Lippett's foot was in "much pain," he believed that it was a "severe infection" related to his long time struggle with athlete's foot, and he believed that he needed "immediate attention." (ECF No. 61-2, Kite, PgID 1759.) According to Nurse Herring's testimony, she evaluated those facts, determined that it was an urgent situation, requiring attention within "a day or two," and set an appointment for the morning of June 28th. (ECF No. 61-4, Herring Dep., PgID 2075–77.) These actions were some treatment—they were steps toward addressing Lippett's medical need—so the question is whether setting an appointment for June 28th was grossly inadequate care. *Terrance*, 286 F.3d at 843–44. According to the doctors hired by Lippett, the delay in diagnosing and treating Lippett's cellulitis led to his sepsis, which led to his kidney failure. (ECF No. 61-2, Polsky Disclosure, PgID 1828; ECF No. 61-2, Pattner Disclosure, PgID 1839–41.) Therefore, Nurse Herring may have provided grossly inadequate care by not setting an appointment sooner. So, if Nurse Herring subjectively perceived the

33

substantial risk involved in delaying care for Lippett's foot infection, her actions in addressing the kite were deliberate indifference.

The subjective element, however is absent—the facts in Lippett's kite were enough for a reviewing nurse to infer a substantial risk of the infection dramatically worsening in the 27 or so hours between Nurse Herring's review of the kite and the appointment she scheduled, but there is no evidence that Nurse Herring actually drew that inference. *See Phillips*, 534 F.3d at 540. The risk that an infection stemming from athlete's foot would worsen past the point where non-IV antibiotics could contain it was not so obvious that the court can conclude that Nurse Herring must have known of it. *Cf. Farmer*, 511 U.S. at 842. Lippett reported significant pain and a long time athlete's foot problem that had not been cured by various ointments. (ECF No. 61-2, Kite, PgID 1759.) He did not report swelling or redness, though perhaps those symptoms could be inferred from his self-diagnosis of infection. (*Id.*) He also did not report that his foot was hot to touch or that he had a fever, chills, or streaking. (*Id.*) The symptoms Lippett reported are therefore easily distinguishable from the symptoms of untreated diabetes in *Phillips*—vomiting blood, nausea, chest pains, and swelling—or the symptoms of appendicitis in *Blackmore*—vomiting and constant sharp abdominal pain. *Phillips*, 534 F.3d at 540–41; *Blackmore*, 390 F.3d at 896. The kite did not indicate how long Lippett had been experiencing his symptoms, so it was not obvious to Nurse Herring that the infection was rapidly

progressing. *Compare Blackmore*, 390 F.3d at 896 (emphasizing the duration of the pain in showing obviousness of Blackmore's serious medical need). Finally, Lippett has not identified any other facts that show that Nurse Herring did, in fact, perceive a substantial risk of harm to Lippett if his foot was not seen earlier.

The undisputed facts show that Nurse Herring did not have a sufficiently culpable state of mind, so Nurse Herring is entitled to qualified immunity. *See Farmer*, 511 U.S. at 834. The Court grants summary judgment to Nurse Herring on the Eighth Amendment claim.

### iv. Nurse Adray

Nurse Adray never directly treated Lippett—his claims against her are based on three events. First, there is a genuine dispute over whether Nurse Adray made the decision to cancel Lippett's appointment on the 28th. (*See* ECF No. 61-3, Lippett Dep., PgID 1912, 1914; ECF No. 61-3, Robison Dep., PgID 1998.) Second, she spoke on the phone with Officer Robison around 12:30 PM on the 28th and told Officer Robison first that Lippett's appointment had been canceled but that he would be seen when a nurse was available and then that the appointment had been rescheduled for another day—refusing his request for immediate treatment. (ECF No. 61-3, Robison Dep., PgID 1998; ECF No. 61-2, Logbook, PgID 1795.) Third, there is a genuine dispute over whether Nurse Adray told another nurse that Lippett was faking and then refused to see him when he went to health care around 2:15 PM

on June 28th. (ECF No. 61-3, Lippett Dep., PgID 1882–83; ECF No. 61-3, Woods Dep., PgID 1961–65; ECF No. 61-3, Rushing Dep., PgID 2028–29.) Each of these actions was a refusal to address Lippett's medical need, so the only question is whether Nurse Adray subjectively perceived a substantial risk of serious harm to Lippett if his treatment was further delayed.

Nurse Adray's first action, canceling Lippett's initial appointment, is very similar to Nurse Herring's decision to schedule an appointment for the 28th rather than see Lippett immediately. Assuming that she was aware of the contents of Lippett's kite—a necessary presumption if she determined his complaint was not a priority and canceled his appointment—she had the exact same amount of information as Nurse Herring. She also knew that a day had passed since Nurse Herring reviewed the kite and that it had been at least a day and a half since Lippett reported his symptoms. That information, as discussed above, supports an inference that substantial risk exists, but does not indicate a level of obviousness that justifies finding that Nurse Adray did infer a risk. Further, Nurse Adray testified that her reading of the kite was that Lippett was "reporting an athlete's foot infection" which, in her view, is "by no means an emergency or even an urgent matter." (*Id.* at 2217.) When Nurse Adray decided to postpone Lippett's appointment for another day, she did not have "a sufficiently culpable state of mind." *See Farmer*, 511 U.S. at 834.

When Officer Robison called Nurse Adray to see if health care could see Lippett that day, Nurse Adray became aware of two additional details. (ECF No. 61-3, Robison Dep., PgID 1998.) First, a corrections officer talked to Lippett and looked at his foot and something about that interaction prompted Officer Robison, who knew that his appointment had been canceled, to call back to ask if there was any chance he could be seen that day. (*Id.*) In other words, a lay person thought Lippett's foot looked bad. Second, Lippett's symptoms had not improved, and had possibly worsened since he submitted his kite. These facts support an inference that there was a substantial risk of harm and increase the obviousness of that risk. These facts do not, however make the risk so obvious that the court can infer that Nurse Adray, who focused on the fact that the kite reported athlete's foot, actually perceived and disregarded the substantial risk.

Finally, if, as a jury could believe, it was Nurse Adray who turned Lippett away when he went to health care the third time on June 28th, around 2:15 PM, and if that was when Woods heard her say that Lippett was faking, she learned two more facts. (ECF No. 61-3, Lippett Dep., PgID 1882–83; ECF No. 61-3, Rushing Dep., PgID 2029.) First, she learned that another layperson thought that there was something wrong with Lippett's foot—Officer Rushing testified that he told the nurse with whom he spoke, who he guessed was Nurse Adray, that Lippett had "an issue." (*Id.*) Second, she learned that Lippett's symptoms were bad enough that he

had come to health care without authorization. These facts increase the obviousness of the risk to the point where it is fair to conclude that she actually perceived the risk. *Farmer*, 511 U.S. at 842. Her comment, that Lippett was "faking," shows a callous disregard of that risk. (ECF No. 61-3, Woods Dep., PgID 1961.) Therefore, the allegation that Nurse Adray turned Lippett away from health care on the afternoon of the 28th constitutes deliberate indifference, which is a clearly established violation of Lippett's Eighth Amendment right to be free of cruel and unusual punishment. *See, Phillips*, 534 F.3d at 539–45; *Estelle*, 429 U.S. at 104. Nurse Adray is not entitled to qualified immunity on the Eighth Amendment claim against her, and the Court denies her request for summary judgment.

### v. Nurse Piecuch

The only basis for Lippett's claim against Nurse Piecuch is the fact that she answered the 4:00 PM call from Officer Tolley when Officer Tolley said, "I think there is like actually really something wrong. You guys might want to call him out." (ECF No. 61-3, Tolley Dep., PgID 2008, 2018.) Nurse Piecuch responded by saying that it was just athlete's foot and that Lippett's call out had been rescheduled. (*Id.* at PgID 2018–20; ECF No. 61-3, Lippett Dep., PgID 1887–88.)

By taking this call and responding that it was only athlete's foot, Nurse Piecuch did not refuse to provide care to Lippett. As an LPN, she is not allowed to assess patients, so the only thing she could have done, and what she likely did do,

was take the patient's number and the reason for the call, then report it to the supervisor or the RN on duty, who would determine what to do with the patient and then call the unit back. (ECF No. 61-4, Piecuch Dep., PgID 2167, 2176–78.) Nurse Piecuch's position is unlike the officers in *Phillips* and *Blackmore*, who had the discretion to seek additional care for the ailing prisoners but chose not to use it, because she did not have discretion. *See Phillips*, 534 F.3d at 537 ("At no point, however, did officials deem Phillip's condition sufficiently serious to require medical evaluation."); *Blackmore*, 390 F.3d at 894 ("At this time, jail officials placed Blackmore into an observation cell, but did not provide any medical treatment."). Also, within a half hour of Nurse Piecuch taking the call, Lippett was treated, so even if she had the discretion to authorize Lippett to come in for treatment, her failure to exercise that discretion only delayed Lippett's treatment by a matter of minutes. (ECF No. 48, Herring Report, PgID 862.) Therefore, there is no genuine issue of material fact on the question of whether Nurse Piecuch was indifferent to Lippett's serious medical needs. She is entitled to qualified immunity, and the Court grants summary judgment to Nurse Piecuch on the Eighth Amendment claim.

### vi. Officer Jordan

Lippett's final Eighth Amendment claim is against Officer Jordan, who turned him away from health care twice on the morning of June 28th—once when Lippett had a call out that had been rescheduled and once when Lippett arrived without

proper authorization. (ECF No. 61-3, Lippett Dep., at PgID 1878–80.) Neither of these actions violated the Eighth Amendment.

Officer Jordan, like Nurse Piecuch, did not have control over the decision to cancel Lippett's appointment. So, even though Lippett informed Officer Jordan that his foot was swollen and that he had a really bad infection, there was nothing Officer Jordan could do other than report Lippett's condition to the nurses and ask them to reconsider canceling the appointment. (*Id.*; (ECF No. 61-5, Jordan Dep., PgID 2245–46.) The same is true regarding Lippett's unauthorized trip to healthcare—Officer Jordan's job required him to turn away unauthorized patients. (ECF No. 61-5, Jordan Dep., PgID 2265–69.) Even if Officer Jordan did inform the nurses that Lippett was there and report his symptoms to them, the nurses' reactions to the communications from Officer Robison, Officer Rushing, and Officer Tolley suggest that any action that Officer Jordan might have taken would not have made a difference.

In addition, Officer Jordan's testimony that he would inform health care personnel if there was an emergency such as a person experiencing difficulty breathing, profuse bleeding, chest pain, or other obviously life-threatening symptoms combined with his failure to inform health care personnel about Lippett's situation indicates that he did not subjectively perceive a substantial risk when Lippett told him his symptoms. (*Id.* at PgID 2245–46.) Although Officer Jordan could have done more to advocate on Lippett's behalf, his failure to do so was not

deliberate indifference to Lippett's serious medical need and he is therefore entitled to qualified immunity. The Court grants summary judgment to Officer Jordan on the Eighth Amendment claim.

### C.    Michigan State Law Gross Negligence against MDOC Defendants

Lippett also brings state-law gross negligence claims against all five MDOC defendants, arguing that they recklessly failed to provide timely and professional medical care. (ECF No. 1, Complaint, PgID 12–14, ¶¶ 66-69.) The MDOC Defendants raise the defense of governmental immunity and challenge these claims on the merits. (ECF No. 56-1, MDOC MSJ, PgID 1027–31.)

Michigan government employees are entitled to immunity from tort liability when they act within the scope of their authority and their conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. L. § 691.1407(2)(c). Michigan courts have made clear that immunity applies unless the grossly negligent conduct is the "most immediate, efficient, and direct cause" of the plaintiff's injury. *Tarlea v. Crabtree*, 263 Mich. App. 80, 89 (Mich. App. 2004) (quoting *Robinson v. Detroit*, 462 Mich. 439, 459 (2000)). There is no dispute that all five MDOC defendants were acting within the scope of their authority, so the only question is whether any defendant's conduct amounted to gross negligence that was *the* proximate cause of Lippett's injury.

Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," which conduct is "substantially more than negligent." Mich. Comp. L. § 691.1407(8)(a); *Maiden v. Rozwood*, 461 Mich. 109, 122 (1999). Put another way, a person is grossly negligent "if an objective observer watched the actor [and] could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea*, 263 Mich. App. at 90. Gross negligence, however, "lacks a requirement that the defendant be subjectively aware that the plaintiff faces a serious risk of injury," so it is a "less onerous" standard than the Eighth Amendment deliberate indifference standard. *Kellerman v. Simpson*, 258 F. App'x 720, 727–28 (6th Cir. Oct. 3, 2007).

Here, no reasonable jury could conclude that any action taken by Nurse Herring, Nurse Draveling, Nurse Piecuch, or Officer Jordan was grossly negligent. Although Nurse Herring, in an abundance of caution, could have scheduled Lippett for an earlier appointment or attempted to examine his foot as soon as she became aware of his belief that it was infected, her failure to do so was not grossly negligent. It may have been ordinarily negligent—Nurse Rogers opined that Nurse Herring should have seen Lippett "promptly" to assess the severity of the infection (ECF No. 61–2, Rogers Disclosure, PgID 1834)—but it may not have been negligent at all— HUM Cooper, the supervising nurse, testified that infections are urgent, not emergent, situations and that Nurse Herring's actions were appropriate. (ECF No.

61-4, Cooper Dep., PgID 2044.) Similar analysis applies to Nurse Draveling, Nurse Piecuch, and Officer Jordan—they could have done more to help Lippett, but even the ordinary negligence standard "does not require one to exhaust every conceivable precaution to be considered not negligent." *Tarlea*, 263 Mich. App. at 90.

Nurse Adray, on the other hand, may have been grossly negligent. Her refusal to see Lippett the afternoon of June 28th and her accusation that he was faking, when his infection had been developing for at least two full days and multiple corrections officers had told her that he had a serious issue, would suggest to an observer that she did simply did not care for Lippett's safety. *See id.* In fact, her actions, viewed in the light most favorable to Lippett, resemble those of Nurse Shubnell in *Kellerman.* 258 F. App'x at 728. In that case, Nurse Shubnell refused to inspect an inmate's open blister despite complaints of pain and the possibility of an infection given prison conditions, saying "I don't want to look at your nasty foot." *Id.* at 722. The Sixth Circuit found that a reasonable jury could conclude that this refusal was grossly negligent and affirmed the denial of governmental immunity for Nurse Shubnell. *Id.* at 728. Here, a jury could find that Nurse Adray refused to look at Lippett's foot or to allow him into health care to be evaluated by another nurse on three different occasions, possibly based on an unfounded belief that he was faking. Those refusals, especially the third one, are similar to the one in *Kellerman*, so a jury could find that Nurse Adray was grossly negligent.

Nurse Adray is still entitled to governmental immunity, however, because Lippett has not produced sufficient evidence to show that Nurse Adray's conduct was the "most immediate, efficient, and direct cause" of the plaintiff's injury. *Tarlea*, 263 Mich. App. at 89. Lippett produced two doctor's reports opining that that the delay in diagnosing and treating Lippett's cellulitis contributed to his sepsis, which led to his kidney failure. (ECF No. 61-2, Polsky Disclosure, PgID 1828; ECF No. 61-2, Pattner Disclosure, PgID 1839–41.) However, these reports do not indicate how much earlier the cellulitis should have been treated to avoid sepsis, and they do not address the fact that Lippett was not diagnosed with sepsis until July 2, when he had been receiving IV antibiotics for three days. (*See* ECF No. 49, Henry Ford Allegiance Records, PgID 907.) Nurse Adray's actions delayed treatment of Lippett's cellulitis for approximately seven hours whereas Nurse Herring's actions, though not grossly negligent, delayed treatment for approximately 27 hours. Under these circumstances, it cannot be determined that the seven hour delay caused by Nurse Adray's possible gross negligence was *the* proximate cause of Lippett's injuries. Therefore, Nurse Adray is also entitled to governmental immunity and the Court grants the MDOC Defendants' Motion for Summary Judgment on the Gross Negligence claim. (ECF No. 56.)

## V.    CONCLUSION

Based on the foregoing reasons the Court GRANTS Defendants Corizon Health, Inc. and Beth Carter, MD's Motion for Summary Judgment (ECF No. 47) and DISMISSES all claims against Corizon and Dr. Carter. The Court also GRANTS Defendants Diane Herring, Sharon Draveling, Thomas Jordan, and Michelle Piecuch summary judgment and DISMISSES all claims against them. The Court GRANTS Defendant Lisa Adray summary judgment on the gross negligence claim against her, but DENIES summary judgment on the Eighth Amendment claim against her.

IT IS SO ORDERED.


Dated:  February 3, 2020                              s/Paul D. Borman
                                                      Paul D. Borman
                                                      United States District Judge